## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## COLUMBUS DIVISION

|  |  |  |
|---|---|---|
| CHERYL BULLOCK, Individually, and KEVIN BULLOCK, Individually | ) ) ) ) | |
| **Plaintiffs,** | ) ) ) | |
| **v.** | ) ) | **Case No.: 4:13-cv-00037-CDL** |
| VOLKSWAGEN GROUP OF AMERICA, INC., et al. | ) ) ) ) | |
| **Defendants.** | ) ) | |

## DEFENDANTS VOLKSWAGEN GROUP OF AMERICA, INC. AND VOLKSWAGEN AG'S MOTION TO EXCLUDE THE TESTIMONY OF LEE HURLEY

Plaintiffs' primary liability expert, Lee Hurley, describes himself as "an automotive person."  Deposition of Lee Hurley (attached as Exhibit A) at 24:1-12. He runs an automobile repair facility and machine shop, id. at 24:13-21, and Mr. Hurley has never designed or built a turbocharger, id. at 62:4-7; 97:12-15.  In fact, Mr. Hurley admits that the engineers at Honeywell and Volkswagen know more about how to design and manufacture a turbocharger and a diesel engine automobile, respectively, than he does.  Id. at 248:2-17.

Perhaps more troubling, however, is the undeniable fact that Mr. Hurley does not remember and has no documentation of *fundamental* details about his

vehicle inspections and the methodology for the very test on which his turbocharger opinions are based.  Even if Mr. Hurley himself wanted to repeat or verify his findings, he could not do so.  He did not photograph, videotape, or otherwise document most of his observations of the Bullocks' Passat, including the "excessive" oil he found in the car's intake system when he first saw it, which he characterizes as the "most compelling evidence" that Cheryl Bullock experienced a unintended, uncontrollable run-on event.  Id. at 452:3-8.

Similarly, he performed "thirty or forty" test runs with an exemplar Passat, but Mr. Hurley only provided minimal data "curves" from two of those tests and did not save any of the electronic data his dynamometer was capable of capturing.  Id. at 170:5-7; 174:18-20.  His body of work cannot be reproduced, verified, or judged by any reliable standard, and all of his opinions relate to a component that he admits is not defective.  Id. at 58:23-59:3, 59:16-20, 250:23-251:5, 323:5-324:8.  Mr. Hurley should not be allowed to offer opinion testimony pursuant to Federal Rules of Evidence 702 and 703, and defendants Volkswagen Group of America, Inc. ("VWGoA") and Volkswagen AG ("VWAG") move to exclude his opinions in their entirety.

## I.    Requirements for the admission of expert testimony.

The admission of expert testimony is governed by Federal Rule of Evidence 702, as explained by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579,

(1993) and its progeny.  See Rink v. Cheminova, Inc., 400 F.3d 1286 (11th Cir.

2005), cert. denied, McFarland v. Cheminova, Inc., 125 S.Ct. 419 (2005).

Specifically, Rule 702 states:

> If scientific, technical, or other specialized knowledge
> will assist the trier of fact to understand the evidence or
> to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training or
> education, may testify thereto in the form of an opinion
> or otherwise, if (1) the testimony is based upon sufficient
> facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied
> the principles and methods reliably to the facts of the
> case.

Id.

Both Rule 702 and Daubert mandate that trial courts act as "gatekeepers" to

ensure that expert testimony heard by the jury is both reliable *and* relevant.  See

McDowell v. Brown, 392 F.3d 1283, 1298 (11th Cir. 2004).  Trial courts must

determine whether:  "(1) the expert is qualified to testify competently regarding the

matters he intends to address; (2) the methodology by which the expert reaches his

conclusions is sufficiently reliable as determined by the sort of inquiry mandated in

Daubert; and (3) the testimony assists the trier of fact, through the application of

scientific, technical, or specialized expertise, to understand the evidence or to

determine a fact in issue."  City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d

548 (11th Cir. 1998).  "District courts are charged with this gatekeeping function to

ensure that speculative, unreliable testimony does not reach the jury under the

mantle of reliability that accompanies the appellation 'expert testimony.'" <u>Rink v. Cheminova, Inc.</u>, 400 F.3d 1286, 1291 (11th Cir. 2005) (internal citation omitted). Federal law places the burden of satisfying each of these three elements on the party offering the expert. <u>See</u> <u>Allison v. McGhan Med. Corp.</u>, 184 F.3d 1300, 1306 (11th Cir. 1999).

Regarding the reliability aspect of the inquiry, the Supreme Court has announced a nonexclusive list of factors: "(1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community." <u>Allison</u>, 184 F.3d at 1312 (citing <u>Daubert</u>, 509 U.S. at 593-94). Regarding the relevancy portion of the test, meanwhile, the expert testimony must "fit" the case, meaning the testimony must be relevant to the issues at hand and assist the trier of fact in resolving those issues. <u>See</u> <u>U.S. v. Frazier</u>, 387 F.3d 1244, 1262-63 (11th Cir. 2004).

<u>Daubert</u> and Rule 702 also demand "specialized knowledge" or experience in the *specific* area under consideration. <u>See</u> <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 156 (1999) ("[T]he question before the trial court was specific, not general. The trial court had to decide whether this particular expert had sufficient specialized knowledge to assist the jurors in determining the particular issues in

this case.") (quotation omitted); <u>Oglesby v. General Motors Corp.</u>, 190 F.3d 244, 247 (4th Cir. 1999) (affirming exclusion of engineer who had consulted in "an array of cases" involving design of various products but had no "particularized experience" with product in question); <u>Tanner v. Westbrook</u>, 174 F.3d 542, 548-49 (5th Cir. 1999) (excluding expert testimony, in part, because physician had no background in studying causes of specific condition); <u>De Jager Constr. Co. v. Schleninger</u>, 938 F. Supp. 446, 449 (W.D. Mich. 1996) (despite "generally" possessing a recognized expertise, CPA did not necessarily qualify to answer "specific questions in a particular case") (internal citations omitted).

It is well settled that "a trial court may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained." <u>Cook v. Sheriff of Monroe County, Florida</u>, 402 F.3d 1092, 1111 (11th Cir. 20045), <u>quoting</u> <u>U.S. v. Frazier</u>, 387 F.3d 1244, 1266 (11th Cir. 2004).  In other words, "nothing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." <u>Cook</u>, 402 F.3d at 1111.

## II.    Mr. Hurley does not have the specialized knowledge regarding turbochargers required by Rule 702 for him to testify about whether the Passat's turbocharger design "may be inadequate."

While Mr. Hurley's qualifications regarding automotive issues *generally* may appear impressive, his qualifications regarding turbochargers are minimal.

An expert's experiences and credentials regarding a broad topic do not necessarily qualify him to testify regarding a subset of information within that broader field. See, e.g., Everett v. Georgia-Pacific Corp., 949 F.Supp. 856, 857 (S.D. Ga. 1996) (general medical practitioner was not qualified to testify regarding toxicology issues); McLendon v. Georgia Kaolin Co., 841 F.Supp. 415 (M.D. Ga. 1994) (economic geologist unqualified to opine regarding a specific mineral with which he had minimal experience).  Rather, that expert must possess "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.

Here, Mr. Hurley's opinions are limited to the area of diesel turbochargers, a vehicle component that he has never attempted to design, Ex. A at 62:4-7, and never manufactured, id. at 97:12-15.  In fact, Mr. Hurley concedes that of all of the accomplishments identified on his *curriculum vitae*, none of them involve diesel engines (the type of engine involved in this case).  Id. at 94:7-11.  While Mr. Hurley may be familiar with the installation and operation of a turbocharger, he lacks the requisite experience or training to testify regarding the design, functionality, performance and build of that component—which are the very issues in dispute here.  Without experience in these areas, Mr. Hurley cannot testify about

them and, more specifically, he lacks the specialized knowledge to testify about risk-utility factors in turbocharger design.[1]

In addition to his lack of qualifications to testify about turbochargers generally, Mr. Hurley is even less qualified to testify regarding his purported alternative design for a turbocharger he has referenced in deposition.  Id. at 252:22-253:17.  Mr. Hurley could not identify the model numbers of any purported alternative design turbochargers and could not offer "any specific numbers of the [turbochargers using the alternative design] without doing some research on it." Id. at 325:17-326:15.  More importantly, Mr. Hurley admitted that he had done no testing, calculations, or analysis whatsoever to establish that a ball-bearing turbocharger design would have prevented this accident.  He testified:

> Q. …Have you done any analysis, testing or calculations to show that had Mrs. Bullock's Passat given its age and its mileage been equipped with a ball-bearing turbo that it would have prevented her alleged, unintended uncontrollable acceleration event?
>
> A. I have done no testing of that sort.

Id. at 464:3-12.  In other words, Mr. Hurley has no knowledge of whether his proposed alternative turbocharger design would have reduced or eliminated the

---

[1] As this Court has observed, simply because a proposed expert is "qualified to testify generally" about a product and its features does not make that witness "likewise qualified to testify that the [product] contains a product defect" because it does or does not possess certain characteristics or features.  Folsom v. Kawasaki Motors Corp. USA, 509 F. Supp. 2d 1364, 1377 (M.D. Ga. 2007).

possibility of Ms. Bullock's accident, and he and is unfamiliar with other details regarding that design other than believing that it was "available way before" 2004 and "think[ing]" that some of the manufacturers who used that design did so for after-market parts, as opposed to being original equipment manufacturers." Id. at 326:4-16.  This generalized familiarity with the alternative design that Mr. Hurley advocates is not the type of specialized knowledge required by Rule 702 in order for this opinion to be helpful.

Given this general lack of turbocharger design and manufacture experience—and especially given his dearth of knowledge regarding the alternative design he recommends—Mr. Hurley does not have the education, training, or experience that Rule 702 requires, and his opinions regarding these issues are inadmissible.

## III.  Mr. Hurley's testing cannot be replicated, verified, or measured against any reliable standard.

Although Mr. Hurley testified that he performed multiple inspections, tests, and experiments on the Bullocks' Passat and an exemplar Passat that he bought for use in this case, Mr. Hurley's documentation of those efforts is practically non-existent.  This dearth of substantiation or validation for Mr. Hurley's work renders his endeavors incapable of satisfying the factors for determining reliability as set forth in Daubert, specifically, whether: (1) the expert's methodologies can be subjected to testing; (2) the expert's theories or techniques have been (or here,

even <u>can</u> be) subjected to peer review; (3) the methodology has a high known or potential rate of error (or here, whether a rate of error can possibly be determined); and (4) whether the scientific community has general accepted the theory.  <u>See United Fire & Cas. Co. v. Whirlpool Corp.</u>, 704 F.3d 1338, 1341 (11th Cir. 2013) (citing <u>Daubert</u>, 509 U.S. at 593-94).

Here, Mr. Hurley conducted multiple visual inspections of the Passat (including one disassembly), conducted multiple tests of an exemplar Passat during which he claims he injected oil into various parts of the vehicle's fuel system while the vehicle ran on a dynamometer, and later inverted the exemplar vehicle on a large "rotisserie"-like device to identify how oil leaked into other parts of the engine with the car resting upside down.  Despite the extensive investigation, inspection, and testing that Mr. Hurley purports to have performed, the information and data that Mr. Hurley *failed* to document about his work is staggering:

- Even though he concedes that photographs are important to him and others to document what he sees at vehicle inspections, Mr. Hurley took no photographs during his February 2012 inspection of the Bullocks' Passat, at which he first saw the "most compelling evidence" of an unintended, uncontrollable run-on event—oil in the intake system. Ex. A at 45:6-11; 49:7-50:11; 92:1-14; 452:3-8.[2]

---

[2] In his deposition, Mr. Hurley specifically acknowledged the importance of photographing vehicle inspections, observing that "rain, sun, and – and God [can do] funny things" to change the condition of evidence over time. <u>Id.</u> 446:8-17.

- Mr. Hurley did not make any measurements of or analyze the amount or kind of oil he found while disassembling the Passat's turbocharger.  Id. at 139:16-140:2, 142:1-18, 142:19-143:15.

- Mr. Hurley did not perform any measurements or analysis of the amount or kind of oil he found while disassembling his exemplar vehicle's turbocharger and related components.  Id. at 108:3-9.

- Mr. Hurley does not have any documentation whatsoever regarding various braking "tests" he performed on his exemplar vehicle.  Id. at 121:18-122:5.

- Mr. Hurley has not produced any photographs, videotape, electronically recorded data, or other documentation of the ambient temperature, fuel pressure, oil pressure, exhaust gas temperature, atmospheric pressure, barometric pressure, engine temperature, wideband $O_2$ level, fuel injection pressure, rate of acceleration, or duration for the two dynamometer tests for which he recorded limited data.  Id. 171:9-174:9.  All such parameters are measured, monitored, and recorded by the dynamometer equipment he used, and he either did not monitor or did not save any such engineering data concerning his "30 to 40" dynamometer test runs, including the two runs he claims prove his ignition key opinions in this matter.  Id. at 29:8-10; 171:9-174:9.  In other words, this is data that Mr. Hurley's dynamometer technology monitors but that he intentionally chose not to record or preserve.

- Mr. Hurley has no documentation whatsoever (photographs, videotape, hard data, electronic data, or otherwise) regarding any of the remaining 28 to 38 dynamometer tests that he reportedly conducted.  Id. at 174:18-20.  The technology Mr. Hurley used while performing these entirely undocumented test runs, of course, monitors all of the data described above, but here, Mr. Hurley neither recorded nor preserved any of it (not even the meager selection of information he decided to print in line graph form for the two runs he partially documented).

- There is no documentation of the multiple unrecorded dynamometer tests involving fuel injection at two unrecorded locations in the exemplar vehicle's fuel system.  Id. at 189:23-193:8.

- Mr. Hurley did not record, videotape, photograph, or otherwise document the presence, quantity, or appearance of smoke during any of his dynamometer runs. Id. at 215:23-216:8.

- Mr. Hurley has not produced any measurements or analysis of the amount or kind of oil he found in his exemplar vehicle after its inversion. Id. at 229:4-230:5.

Taken together, all of the data and documentation for Mr. Hurley's work is contained in thirty-six (36) photographs and two line graphs. See Hurley Exhibits 6, 7, 11, and 12 (collectively attached as Exhibit B)[3]. This paucity of hard data coupled with Mr. Hurley's vague testimony regarding his methodology (e.g., testifying that the exemplar vehicle ran for "[t]wenty seconds plus whatever time it took to stall it out. Maybe a couple of seconds…" Ex. A at 210:15-17) forces any party wishing to scrutinize his efforts to simply guess what exactly it was that Mr. Hurley did with his exemplar vehicle during his 30 to 40 undocumented or partially-documented runs.

Equally troubling regarding the pair of dynamometer runs that Mr. Hurley documented in part is how he selected the two for which he would document and preserve limited data. Mr. Hurley concedes that he chose to document the two runs for which he produced line graphs solely "because those demonstrated what [he] wanted [defense counsel] to see." Id. at 176:16-20. Mr. Hurley did not want

---

[3] Mr. Hurley also produced a line graph that was labeled at his deposition as Exhibit 13. This graph, however, included no unique data and was simply a hybrid of the graphs in Exhibit 11 and 12 laid over one another on a single chart.

the defendants to see the results of the remaining 28 to 38 tests he performed, so he simply did not document them in any form or fashion.  Further, despite the fact that Mr. Hurley decided to produce line graphs showing curves for torque, speed, horse power, and boost pressure for his two hand-picked runs, he did not preserve or produce any of the data points that support those line graphs, see id. at 170:19-22 Ex. B at 11-12.  So, instead of producing a table showing exact values for those various inputs at specific times during Mr. Hurley's test run, he instead produced a simplified chart that showed only imprecise values:



Id. at 11.  This is despite the fact that Mr. Hurley's technology is capable of recording such particulars.  See Ex. A at 167:8-170:4

In fact, Mr. Hurley's intentional failure to document his dynamometer testing with any specificity led to one of the most revealing exchanges in his deposition. Mr. Hurley produced a graph from a test that he said he conducted to show how his exemplar Passat would operate if the ignition key was turned to the off position.[4] According to Mr. Hurley, the graph shows that his Passat, even with the ignition key (and the engine) turned off, continued to run solely on oil that he had injected into the engine. Id. at 195:9-12. Mr. Hurley testified as follows:

> Q. All right. In other words, the purpose of your test at the end of the day was to prove that the engine would keep running on the injected oil even after the key was turned off?
>
> A. Correct.
>
> Q. That's what you were trying to show?
>
> A. That was – that was the intent of it, yes.

Id. at 207:3-12.

Mr. Hurley later admitted, however, that he was not sure he actually turned the ignition key off, claiming he is an "old man" and "could have made a mistake" and forgotten to turn it off. Id. at 416:9-18. Critically, the very foundation of his opinion that he could make this diesel engine run and "race" by introducing engine oil only, while eliminating the flow of diesel fuel by turning off the ignition key,

---

[4] Mr. Hurley does not contend that Ms. Bullock attempted to stop her Passat by turning off the engine. Id. at 220:12-221:21.

falls apart because he cannot even say if he did, in fact, turn off the exemplar Passat's ignition. There are no photographs, videotapes, or other documentation of any kind to confirm whether Mr. Hurley's self-described "old man" memory is correct. Id. at 171:9-174:9. This is the very danger that Daubert's requirement of repeatability of methods and procedures is designed to protect against. Plaintiff's so-called expert claims that he may—or may not—have caused an engine to run on oil by turning off the ignition key—or maybe not. This cannot serve as a valid basis for Mr. Hurley's opinions in this case.

Due to Mr. Hurley's widespread failure to document his efforts in this case, his work is impossible to accurately replicate, test, confirm, or challenge. Mr. Hurley's *take-my-word-for-it* evidence, minimal data, and vague descriptions of his work simply do not provide enough information for his test conditions to be recreated and verified or refuted. This is fatal to the admissibility of Mr. Hurley's opinion, because "[a] basic requirement under Daubert is that the methodology followed is capable of being replicated." Smith v. Freightliner, LLC, 239 F.R.D. 390, 393 (D.N.J. 2006). Based on this bedrock requirement, many federal courts have excluded expert testimony based on their conclusion that tests and data that cannot be replicated cannot be reliable. See, e.g., Bricklayers and Trowel Trades Intern. Pension Fund v. Credit Suisse Securities (USA), 752 F.3d 82 (1st Cir. 2014) (excluding economist's opinions in part because they could not be accurately

replicated and tested); <u>Deficcio v. Winnebago Industries, Inc.</u>, 2014 WL 4211274, at *6-7 (D.N.J. Aug. 25, 2014) (excluding opinion based on lack of ability to replicate the expert's methodology, which rendered the expert's work as not having a testable hypothesis); <u>Snoznik v. Jeld-Wen, Inc.</u>, 2010 WL 1924483, at *13 (W.D.N.C. May 12, 2010) (excluding an expert's testimony and noting that "[w]ithout adequate documentation, whether in writing, through photographs or by video, [the excluded expert's] testing simply cannot be replicated by others in the scientific community.").

What Mr. Hurley saw, did not see, did, and did not do is supported by nothing more than his personal memories. Even his two line graphs must be excluded, because he cannot remember if he in fact turned off the ignition key during one of those two dynamometer runs, which was the most critical element of the test he created to "prove" his ultimate opinion of "run-on" diesel engine. Given the absence of data supporting Mr. Hurley's work in this case, his tests and related results cannot be replicated, his conclusions are not reliable, and his opinions should be excluded.

## IV.    Mr. Hurley's vague and conclusory opinions are neither meaningful nor helpful.

Instead of reaching objective, quantifiable conclusions regarding the Bullocks' Passat and their defect allegation, Mr. Hurley instead reaches broad, imprecise conclusions. "Nothing in either <u>Daubert</u> or the Federal Rules of

Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." Kumho, 526 U.S. at 157. Rather, as it relates to reliability, "it is not the general acceptance of the methodology that is relevant rather, it is the 'reasonableness of using such an approach, along with [the expert's] particular method of analyzing the data obtained, to draw a conclusion regarding the particular matter to which the expert testimony [is] directly relevant.'" Jack v. Glaxo Wellcome, Inc., 239 F.Supp.2d 1308, 1315 (N.D. Ga. 2002) (quoting Kumho, 526 U.S. at 154)).

Mr. Hurley has no discernible basis for reaching his conclusions regarding the Bullocks' Passat and the condition of his exemplar vehicle after testing. For example, Mr. Hurley opined that the amount of oil shown in post-testing photographs of his exemplar was "excessive" but did not measure those amounts. Ex. A at 142:1-10. When later asked for more detail about this opinion, Mr. Hurley gave this explanation:

> Q. And so when you as a mechanic look at something and you say, that looks like excessive oil to me, what's your basis for saying that?
>
> A. Well, the amount of oil that I saw in the areas that should not have oil in them was – was basis for my opinion of that.

Id. at 364:13-20. This is the essence of *ipse dixit*. Mr. Hurley provides no standard against which his opinion of "excessive" can be measured and, instead,

simply explains that it is excessive because it is more than it should be.  He further

offers no explanation for why the Passat, after operating without incident for more

than seven years, suddenly experienced an unexplained run-on event:

> Q.   Why would a car like the Bullock vehicle that ran
> perfectly fine for 115,000 miles all of a sudden develop
> this condition and have a diesel engine runaway?  Can
> you explain that?
>
> A.    If – if I had that answer, I would be working for
> Volkswagen.

Id. at 381:22-382:5.

These are the kinds of opinions that Daubert was formulated to keep away

from a jury.  Mr. Hurley's conclusions are inadmissible.

## V.    Mr. Hurley's opinions are irrelevant, as he has admitted under oath that the turbocharger is not defective.

Mr. Hurley's opinions regarding the turbocharger are not admissible because

they are not relevant.  Fed. R. Evid. 401 plainly states that "[e]vidence is relevant

if: (a) it has any tendency to make a fact more or less probable than it would be

without the evidence; and (b) the fact is of consequence in determining the action."

Pursuant to Fed. R. Evid. 402, "irrelevant evidence is not admissible."

Mr. Hurley testified at least three times that the Passat's turbocharger was

*not* defective.  See Ex. A at 58:23-59:3, 59:16-20, 250:23-251:5, 323:5-324:8 (*E.g.*,

"But as far as [the turbocharger] being a defective design, I don't think you – I

don't think I could use that word of a defective design.").  Accordingly, Plaintiffs'

claims fail as a matter of law, and Mr. Hurley's opinions have no "consequence in determining the action" as is required to be relevant under Rule 401.  Because the opinions are irrelevant, they are inadmissible as a matter of law by Rule 402 and should be excluded.

## VII.  Mr. Hurley is not qualified to testify as an expert under Rule 702, and none of his opinions meet the requirements of Rule 703 or <u>Daubert</u>.

The trial court's obligation is "to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value."  Allison v. McGhan Medical Corp., 184 F.3d 1300, 1311-12 (11th Cir. 1999).  Mr. Hurley's opinions, if admitted, would undermine these critical directives and result in a jury being flooded with information that has no trustworthy basis in the facts of the case or the scientific method.  His testimony should be excluded.[5]

/s/ Harlan I. Prater, IV
Attorney for Volkswagen Group of America, Inc.
and Volkswagen AG

---

[5] Mr. Hurley's opinions are also due to be excluded for the reasons stated in defendant Honeywell International, Inc.'s Motion in Limine Under Rules 702 and 703 to Exclude the Expert Opinion of Lee Hurley

OF COUNSEL:
Jackson R. Sharman, III (State Bar of Georgia No. 637930)
Harlan I. Prater, IV (Lead Counsel, admitted *pro hac vice*)
J. Chandler Bailey (admitted *pro hac vice*)
James W. Gibson (admitted *pro hac vice*)
LIGHTFOOT, FRANKLIN & WHITE, LLC
The Clark Building
400 20th Street North
Birmingham, Alabama 35203
Telephone: (205) 581-0700

Richard Y. Bradley
BRADLEY & HATCHER, LLP
33 West 11th Street, Suite 100
Columbus, GA  31901
Telephone: (706) 660-9988

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of December, 2014, the foregoing was served electronically to the following counsel of record:

Kendall C. Dunson
D. Michael Andrews
BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.
218 Commerce Street
Montgomery, AL  36104
Telephone: (800) 898-2034

Richard H. Willis
Joel H. Smith
Patrick J. Cleary
BOWMAN & BROOKE, L.L.P.
1441 Main Street, Suite 1200
Columbia, SC  29201
Telephone: (803) 726-7420

Gene A. Major
FAIN MAJOR & BRENNAN, P.C.
100 Glenridge Point Parkway, Ste. 500
Atlanta, GA  30342
Telephone: (404) 688-6633

/s/ Harlan I. Prater, IV
Attorney for Volkswagen Group of America, Inc.
and Volkswagen AG