IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

CHERYL BULLOCK and KEVIN          *
BULLOCK,
                                  *
        Plaintiffs,
                                  *
vs.
                                  *      CASE NO. 4:13-CV-37 (CDL)
VOLKSWAGEN GROUP OF AMERICA,
INC., VOLKSWAGEN AG, and           *
HONEYWELL INTERNATIONAL, INC.,
                                  *
        Defendants.
                                  *
_____

O R D E R

In Virgil's ancient epic poem *The Aeneid*, Diomede advises the Latians to avoid war based on his personal experience. Virgil uses the phrase e*xperto credite* ("believe the expert") in the original version to explain why Diomede should be believed.[1]

Like many product liability actions, liability in this case depends on which parties' experts are believed. Since the days of Virgil, particularly in the federal courts, some have grown skeptical of those who base their expertise on their own personal experience. Many modern day lawyers and judges would scoff at Diomede's suggestion of *experto credite*. They would likely label his attempt to support his opinion that war should

---

[1] Virgil, *Aeneid,* bk. XI, l. 283. *See The Works of Virgil: Translated into English Prose* vol. II at 381 (1821), available at https://books.google.com/books?id=JBA-AQAAMAAJ&pg=PP1 (last visited May 7, 2015).

be avoided based on his first-hand experiences in war with the oft-quoted *Daubert* motion favorite—expert opinion evidence must be rejected when the foundation of the opinion is the *ipse dixit* of the expert ("believe it solely because I said it").[2] This skepticism arises especially when an expert does not have multiple advanced degrees or maintain an up-to-the-minute *curriculum vitae* on his web site; but instead bases his opinion primarily on personal experience. In this case, one of Plaintiff's experts, Lee Hurley, is a veteran automobile mechanic with over 40 years experience. He may be no Diomede, but he confirms the wisdom of Virgil's observation that old-fashioned first-hand experience can be a powerful thing.

Before reaching the merits of the pending motions, a few additional observations about the pervasive use of *Daubert* motions in modern day litigation are appropriate. Much of the *Daubert*-related skepticism of expert testimony arises in part from an apparent concern that ordinary citizens are incapable of evaluating the credibility of some types of opinion evidence. Thus, we have anointed the omniscient judge as the gatekeeper to determine what opinions a jury should and should not hear. The

---

[2] *See* Black's Law Dictionary, *ipse dixit* (10th ed. 2014) (translating *ipse dixit* as "he himself said it" and defining the phrase as "Something asserted but not proved"); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

gatekeeper role originated over concerns about "junk science," but some have expanded it to decide cases on the merits based on an assessment that the expert's opinion is not credible. Allowing such credibility assessments to lock the gate to the jury box removes decisions traditionally best left to the common sense and varied life experiences of a properly instructed jury. Although the Court certainly has a duty to perform its gatekeeping function, it must be careful to recognize the distinction between excluding evidence based on skepticism as to its believability (an assessment to be made by the jury) and excluding evidence because it is not reasonably reliable (a job for the judge).  In some cases, this distinction becomes blurred and is difficult to ascertain.  This is not such a case.

Plaintiffs Kevin and Cheryl Bullock filed this product liability action against Defendants Volkswagen Group of America, Inc., Volkswagen AG, and Honeywell International, Inc., alleging that the Honeywell turbocharger in their 2004 Volkswagen Passat was defective.  They contend that as a result of the defective turbocharger, the vehicle suddenly and unintendedly accelerated, causing Mrs. Bullock to lose control of it.  The car left the roadway and flipped, and Mrs. Bullock suffered injuries from the crash.  She seeks to recover damages for her personal injuries; her husband seeks damages for loss of consortium.  To prove that the turbocharger was defective and contributed to the crash,

Plaintiffs rely on two expert witnesses: Lee Hurley, an automotive mechanic with over 40 years of experience; and Mark Hood, a materials engineer.

The Court finds that Plaintiffs' experts are sufficiently qualified and their opinions are adequately reliable and adjusted to the facts of this case such that a jury should hear their opinions and decide whether to believe them. Accordingly, for the reasons explained in the remainder of this Order, Defendants' motions to exclude the testimony of Plaintiffs' experts (ECF Nos. 49, 50, 51, & 52) are denied. Because that testimony, along with other evidence in the record, creates genuine factual disputes as to Defendants' liability in this case, Defendants' summary judgment motions (ECF Nos. 53 & 56) are also denied in large part. Plaintiffs' motion to exclude one of Defendants' experts (ECF No. 54) is also denied.

DISCUSSION

I.  **Defendants' *Daubert* Motions**

    A.  <u>Standard for the Admissibility of Expert Opinions</u>

Under Federal Rule of Evidence 702, the Court must serve as the gatekeeper "to keep out irrelevant or unreliable expert testimony." *United States v. Ala. Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145 (1999) and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993)). "This gatekeeping role, however, is

not intended to supplant the adversary system or the role of the jury: vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 1282 (internal quotation marks omitted).

In evaluating the admissibility of expert testimony under Rule 702, the Court must consider whether "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable . . .; and (3) the testimony assists the trier of fact . . . to understand the evidence or to determine a fact in issue." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc). Many cases, particularly those involving opinion testimony that relies on the scientific method, cite the traditional factors that courts should consider when determining whether an expert's methodology is sufficiently reliable: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential error rate of the technique; and (4) whether the technique is generally accepted in the scientific community." *Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1327 (11th Cir. 2014) (per curiam). These factors, of course, represent a non-

exhaustive list and "'do not constitute a definitive checklist or test.'" *Id.* (quoting *Kumho Tire*, 526 U.S. at 150). "While those factors may help in assessing the reliability of scientific or experience-based expert testimony, the district court's 'gatekeeping inquiry must be tied to the facts of a particular case.'" *Id.* (quoting *Kumho Tire*, 526 U.S. at 150). In its gatekeeping role, the Court's focus must be on the reliability of the testimony, not simply whether it fits within the narrow confines of lawyer-urged litmus tests. While "'each stage of the expert's testimony [must] be reliable, . . . each stage must [also] be evaluated practically and flexibly without bright-line exclusionary (or inclusionary) rules.'" *Frazier*, 387 F.3d at 1262 (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999)). Although it is certainly appropriate in some cases to scrutinize "'how often an engineering expert's experience-based methodology has produced erroneous results, or whether such a method is generally accepted in the relevant engineering community. . ., it will [likewise] at times be useful to ask even of a witness whose expertise is based purely on experience . . . whether his preparation is of a kind that others in the field would recognize as acceptable.'" *Id.* at 1262 (quoting *Kumho Tire*, 526 U.S. at 151). The Court's goal is to ensure that an expert "'employs in the courtroom the same level of intellectual rigor that characterizes the practice of

an expert in the relevant field.'" *Id.* at 1260 (quoting *Kumho Tire*, 526 U.S. at 152). "Sometimes the specific [traditional] *Daubert* factors will aid in determining reliability; sometimes other questions may be more useful." *Id.* at 1262. To allow the testimony to be considered by the jury, the Court must find that "'it is properly grounded, well-reasoned, and not speculative.'" *Id.* (quoting Fed. R. Evid. 702 advisory comm. note (2000 amends)).

### B.   Lee Hurley

Lee Hurley is a motor vehicle mechanic. He has been a mechanic for more than forty years. Hurley has worked with all kinds of engines, including turbocharged diesel engines like the one in Mrs. Bullock's Passat. Hurley has investigated and diagnosed unintended acceleration events in cars, and he designed a solution to fix a problem with unintended acceleration in prior model Volkswagen turbocharged engines.

In this case, Hurley intends to explain how a turbocharged engine works and how oil migrates through the engine. He also intends to explain the basis for his opinion that oil seeped through the turbocharger's compressor seal and ultimately into the Passat's engine, creating an unintended acceleration event. To reach his conclusions, Hurley relied on his experience as a mechanic, his inspections of the Passat and its components, and

his testing of an exemplar Volkswagen Passat that had the same turbocharged diesel engine as Mrs. Bullock's Passat.

Based on Hurley's affidavits, expert report, and *Daubert* hearing testimony, Hurley has extensive experience inspecting, evaluating, testing, and diagnosing engine problems, as well as building, servicing, repairing, designing, and modifying automotive engines—including turbocharged diesel engines. Based on Hurley's experience, the Court finds that he is qualified to testify about the matters he intends to address.

Defendants contend that even if Hurley is qualified to give an expert opinion in this case, his opinion is not based on reliable methodology and should therefore be excluded. Defendants argue that Hurley's opinion is nothing more than an *ipse dixit* assessment, *i.e.*, my opinion is reliable because I am an expert and I say that it is. Defendants misunderstand and mischaracterize the nature and basis of Hurley's opinions. Hurley formed his opinions by observing the physical evidence, testing an exemplar vehicle, and drawing on his extensive experience in the field. That is not an *ipse dixit* assessment.

Hurley personally reviewed the available physical evidence—Mrs. Bullock's Passat—and observed excessive amounts of oil indicating a leak from the turbocharger seal. Hurley explained that while he did not conduct a precise measurement of the oil, he knew based on his skill and experience that the amount of oil

he saw where he saw it was excessive.  Moreover, evidence of the excess oil remains on the component parts of the vehicle and can be shown to the jury as the jury evaluates Hurley's opinions. He explained why the failure to measure the excessive oil down to the closest gram or milliliter does not diminish the reliability of his conclusion.  Hurley also stated that reasonable mechanics of similar experience and knowledge would reach the same conclusion based on generally accepted principles of automotive mechanics and on Volkswagen's representations regarding how much oil should be in the turbocharger and the intake hoses.

A multi-page, Latin-titled listing of every degree ever received and every seminar ever attended does not always qualify someone as an expert witness.  Nor does an opinion necessarily have to be unduly complicated to be reliable.  Hurley has spent his entire life since age seven in a garage.  He has studied automobiles—listening to owners' complaints, examining their vehicles, diagnosing what is wrong with them, and then devising a plan to fix them.  Hurley has torn down engines and turbochargers.  He has seen how they work.  He has personally encountered the very problems that allegedly existed in Mrs. Bullock's Passat.  He has observed how excessive oil escaping from a turbocharger can create an accelerant for the engine, producing unintended acceleration.  He did not learn this by

doing a Google search or by being in front of a blackboard (or smartboard). He experienced it. His classroom was the garage. He explained how his examination of the vehicle after the crash supports his opinions. Essentially, he opines that no more than a *de minimis* amount of oil should escape from the turbocharger because excess oil can create an accelerant that can cause unintended acceleration. And he found substantially more than *de minimis* oil in an area where it could only have been found if there was a substantial leak from the turbocharger. He eliminated the other possible sources of the oil and concluded the most likely source was the turbocharger's seal. Hurley adequately explained how his own personal experience led him to his conclusions and why those opinions are reliable. *Cf. Frazier*, 387 F.3d at 1261 (noting that a "witness must explain how [his] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts"). Quite frankly, only a zealous advocate (or perhaps an arrogant judge) could maintain with a straight face that the person who they would likely first visit if they had a problem with a vehicle accelerating unintentionally and who they would likely depend on to diagnose and correct the problem would nevertheless not fall within the class of persons who could testify before a jury on that same subject matter.

Although Hurley's opinions are not entirely dependent on some of his testing in this case, the Court finds it appropriate to address that testing to facilitate the admissibility of that evidence at trial. Hurley conducted testing on an exemplar Volkswagen Passat with the same turbocharged diesel engine as Mrs. Bullock's. He inverted the exemplar vehicle to determine whether the oil may have spilled from the crankcase ventilation tube while Mrs. Bullock's Passat was inverted, contributing to the excessive oil he found. Hurley concluded that this test supported his opinion that the crankcase ventilation tube was not the source of the excessive oil. And while he acknowledged that the crankcase ventilation tube could be the source of a very small amount of oil, he explained why it was unlikely that the excessive oil he observed came from the crankcase ventilation tube.

In addition to his inversion test, Hurley also ran tests on the exemplar vehicle to corroborate his experience-based opinion that an unintended acceleration event could occur if engine oil leaked into the intake. Based on those tests, which involved the use of an instrument called a dynamometer, Hurley demonstrated that the engine could continue to run on engine oil added directly into the intake while the engine was running but while the engine was not mechanically accelerated through operator input. Defendants' chief complaint about this testing

is that Hurley did not provide sufficient data so that his tests could be recreated.  Hurley, however, provided Defendants with "turbo boosts, the RPM, accelerometer data, the load cell, the speeds, the torque, and the engine horsepower."  Hurley Aff. 1-2, ECF No. 67-12.  And he used standard dynamometer correction factors.  The Court is satisfied that Hurley has established that his dynamometer methodology is sufficiently reliable to be presented to a jury.

Finally, Defendants boldly proclaim that Hurley's conclusions are contrary to the laws of physics.  But Hurley reasonably explained how the oil moved as he says it did.  *See, e.g.,* Hurley Aff. 2.  Defendants may certainly engage in a thorough and sifting cross-examination of Hurley, but their hyperbole does not support the wholesale exclusion of Hurley's testimony.  *See Ala. Power Co.*, 730 F.3d at 1282 (distinguishing the Court's role as gatekeeper from the jury's role as factfinder).

In addition to their reliability objections, Defendants argue that Hurley's testimony does not "fit" the case and would not be helpful to the jury.  "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry."  *Daubert*, 509 U.S. at 591-92.  Defendants contend that Hurley's opinions are irrelevant because he testified during his

deposition that he did not think there was a design defect in the Passat:

> Q: Did you in your work in this case see what you considered to be a design defect in the Bullock Passat?

> A: I wouldn't cite it as the design defect, but there were all other alternatives to methods of turbocharger that would have decreased the potential of this runaway.

Hurley Dep. 59:16-23, ECF No. 52-1. Taken in the context of his entire testimony, it is clear that Hurley is of the opinion that the turbocharger's compressor seal failed and allowed oil to migrate into the Passat's engine and create an unintended acceleration event. That, along with evidence of a safer feasible alternative design (which is discussed in more detail below), is enough to let a jury decide whether a design defect caused Mrs. Bullock's wreck.

In sum, the Court finds that Lee Hurley should be permitted to offer his expert opinions in this case. Defendants' motions to exclude him (ECF Nos. 49, 50, & 52) are therefore denied.

C. Mark Hood

Mark Hood is a materials engineer. He is a professional engineer, and he has specialized in materials engineering and materials failure analysis for thirty years. In that role, Hood conducts forensic analyses to determine whether a product's design contributed to its failure to perform its function. Defendants assert that Hood is not qualified to render any

opinions regarding the alleged failure of the turbocharger compressor seal in this case because he is not a turbocharger designer and has not previously examined the precise type of turbocharger at issue in this case.  But Hood presents evidence that he is experienced in automotive component analysis and has significant experience with aviation turbochargers, which have the same basic design as automotive turbochargers.  Based on Hood's expert report and *Daubert* hearing testimony, the Court finds that he is qualified to testify regarding the matters he intends to address.

Hood intends to explain that the purpose of the turbocharger compressor seal is to prevent oil from leaking past it.  He intends to explain that his inspection of the turbocharger components revealed two reasons why oil leaked past the compressor seal: a single piston ring design and service wear on the compressor seal.  He ultimately concludes that the turbocharger in Mrs. Bullock's Passat was defective because it failed and allowed oil to leak past the compressor seal.  Hood also intends to explain that Honeywell was aware of problems with compressor end seal leaks and that there were safer, economically feasible alternative designs that would have reduced the likelihood of a compressor end seal leak in Mrs. Bullock's Passat.  To reach his conclusions, Hood relied on his experience as a materials engineer, his inspections of the

14

Passat and its components, and Honeywell's documentation about the family of turbochargers that included the one at issue here.

Defendants assert that Hood's testimony should be excluded because it merely parrots the opinions of Hurley. Based on Hood's expert report and *Daubert* hearing testimony, the Court finds that Hood's opinions are based on his independent failure analysis of the turbocharger. Defendants do not clearly articulate why his methodology—inspecting the Passat and its components and reviewing the available documentation—is flawed. Rather, Defendants focus on the *conclusions* Hood reached in his failure analysis and argue that his opinion must be rejected because they say he (1) mistakenly identified an assembly mark on the compressor end seal as evidence of service wear and (2) misinterpreted the Honeywell documents he relied on in reaching his conclusions. The Court finds that the disputes about one of Hood's service wear findings and his interpretation of the Honeywell documents go to the weight of the evidence, not its admissibility. Defendants may certainly address these arguments on cross-examination.

In sum, the Court finds that Mark Hood should be permitted to offer his expert opinions in this case. Defendants' motion to exclude him (ECF No. 51) is therefore denied.

## II.  Defendants' Summary Judgment Motions

### A.  Summary Judgment Standard

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is *material* if it is relevant or necessary to the outcome of the suit.  *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.  *Id.*

### B.  Factual Background

Viewed in the light most favorable to Plaintiffs, the record reveals the following.

On September 5, 2011, Mrs. Bullock was driving her Passat on Georgia Highway 1 in Stewart County, Georgia.  According to Mrs. Bullock, she was driving normally when, all of a sudden and without warning, her Passat accelerated uncontrollably.  Mrs. Bullock took her foot off the accelerator and pressed the brakes all the way to the floor, but the car continued to accelerate. In sixty seconds, the car accelerated from 70 miles per hour to

16

90 miles per hour and then collided with a truck that was parked in the emergency lane.  The car rolled over at least two-and-a-half times and came to rest on its roof.  Mrs. Bullock was injured as a result of the collision.

C.   <u>Analysis</u>

Defendants argue that all of Plaintiffs' claims fail as a matter of law.  As discussed in more detail below, the Court finds that genuine factual disputes exist and preclude summary judgment on Plaintiffs' design defect and failure to warn claims.

Plaintiffs concede that their claim for wantonness fails, so Defendants are entitled to summary judgment on that claim. And Plaintiffs did not respond to Defendants' summary judgment motion on their failure to recall/retrofit claim; therefore, the Court finds that Plaintiffs abandoned that claim, and Defendants are entitled to summary judgment on it.  *Cf. Ford Motor Co. v. Reese*, 300 Ga. App. 82, 85, 87, 684 S.E.2d 279, 283-85 (2009) (noting that "Georgia common law does not impose a continuing duty upon manufacturers to recall their products" unless "special circumstances" exist).

1.   *Design Defect Claims*

Under Georgia law, a product design is defective if "the risks inherent in a product design [outweigh] the utility or benefit derived from the product."  *Banks v. ICI Ams., Inc.*, 264

Ga. 732, 734, 450 S.E.2d 671, 673 (1994).  The trier of fact generally decides whether the risk of harm outweighs the utility of a design.  In making that determination, the factfinder may consider: (1) "the usefulness of the product;", (2) "the gravity and severity of the danger posed by the design;" (3) "the likelihood of that danger;" (4) "the avoidability of the danger;" (5) "the manufacturer's ability to eliminate the danger without impairing the product's usefulness or making it too expensive;" and (6) "the feasibility of spreading the loss in the price or by purchasing insurance." *Dean v. Toyota Indus. Equip. Mfg., Inc.*, 246 Ga. App. 255, 259, 540 S.E.2d 233, 237 (2000).

Defendants contend that Plaintiffs' design defect claims fail because (1) Hurley never opined that the turbocharger is defective, (2) Plaintiffs did not present sufficient evidence of a feasible alternative design that would have prevented the runaway event, (3) Plaintiffs did not establish any similar incidents that involved a car with the same engine and turbocharger as Plaintiffs', and (4) Plaintiffs cannot exclude the reasonable possibility that the wreck was caused by something other than a defect in the turbocharger compressor end seal.

First, Defendants pounce on Hurley's reluctance to describe the problem he witnessed as a design "defect."  *See* Hurley Dep.

18

59:16-23, ECF No. 52-1.  Whether a design defect exists depends on whether there is sufficient evidence for a reasonable factfinder to conclude that the risk of the design outweighed its benefit.  The essence of Hurley's testimony is that the turbocharger's compressor seal failed and allowed oil to migrate into the Passat's engine and create an unintended acceleration event.  He clearly stated that this should not be allowed to happen.  Engineer Hood opines that a safer alternative feasible design existed.  The jury can consider Hurley's opinions, along with Hood's engineering opinions and the other evidence, and decide whether a design defect exists without Hurley expressly labeling his findings as a design defect.

Second, Defendants contend that Plaintiffs did not present sufficient, admissible evidence of a feasible alternative design that would have prevented the alleged runaway event.  This argument ignores Hood's testimony, which the Court has refused to exclude.  Hood opines that a safer, economically feasible alternative design existed before Mrs. Bullock's Passat was manufactured and that the alternative design would have reduced the likelihood of an unintended acceleration event.  That opinion is based on Hood's inspection of the Passat and its components, as well as his review of Honeywell's documentation regarding problems with the turbocharger compressor end seal in the family of turbochargers that included the one at issue here.

The Court is satisfied that sufficient evidence exists on this issue to be considered by a jury.

Third, Defendants argue that Plaintiffs did not establish any similar incidents that involved a car with the exact same engine and turbocharger as Plaintiffs'.  They appear to contend that without any reported similar incidents, Plaintiffs cannot establish that there was a significant likelihood of danger, so the risk of injury cannot outweigh the utility of the design as a matter of law.  Again, the risk-utility factors are generally to be weighed by the trier of fact.  *Dean*, 246 Ga. App. at 259, 540 S.E.2d at 237.  There is sufficient evidence for the jury to conclude that Defendants were aware of compressor seal leakage in Honeywell turbochargers like the one in Mrs. Bullock's Passat but did not employ a safer, economically feasible alternative design.

Fourth, Defendants assert that Plaintiffs cannot exclude the reasonable possibility that something other than a defect in the turbocharger compressor end seal caused the wreck, such as oil that leaked from the crankcase ventilation tube.  But Hurley's testimony, if believed, supports a finding that the excessive oil Hurley observed in the turbocharger and intake hoses came not from the crankcase ventilation tube but from a leak in the turbocharger compressor end seal.

In sum, if a jury believes Plaintiffs' experts, the jury would be authorized to conclude that a design defect in the Passat's turbocharger compressor end seal caused the wreck that injured Mrs. Bullock.

### 2. Failure to Warn Claim

Defendants argue that Plaintiffs' failure to warn claims are not supported by the evidence because Plaintiffs did not present an expert to testify that Defendants' warnings were inadequate. The crux of Plaintiffs' failure to warn claim is that Defendants knew about compressor seal leakage in Honeywell turbochargers like the one in Mrs. Bullock's Passat but did not either (1) employ a safer, economically feasible alternative design or (2) warn consumers of the risks associated with compressor seal leakage. In general, a manufacturer breaches its duty to warn by "(1) failing to adequately communicate the warning to the ultimate user or (2) failing to provide an adequate warning of the product's potential risks." *Camden Oil Co. v. Jackson*, 270 Ga. App. 837, 840, 609 S.E.2d 356, 359 (2004). The issue here is not whether an existing warning was adequately worded or placed, which could under certain circumstances require expert testimony to resolve. The issue is whether a warning should have been given at all. Plaintiffs contend that Defendants knew of risks with the design but provided *no warning*. A jury can understand this issue without a

warnings expert.   The Court declines to grant summary judgment on Plaintiffs' failure to warn claim.

## III. Plaintiffs' *Daubert* Motion

Plaintiffs seek to exclude the testimony of Dr. Rodney Radtke, a board-certified neurologist who opines that Mrs. Bullock suffered an epileptic seizure that caused her to drive erratically just prior to the wreck.   Radtke reviewed the following:  Mrs. Bullock's medical history; the police report about the accident; and the sworn deposition testimony of Mrs. Bullock, the eyewitnesses who saw the wreck and the events leading up to it, and the emergency responders.

Plaintiffs do not seriously contend that Radtke is not qualified to render an expert opinion in this case.   Radtke is a board-certified neurologist who is also a board-certified specialist in epilepsy.   He has specialized in the treatment of epilepsy for thirty years, and he currently treats more than 800 patients with epilepsy.   Radtke is qualified to testify regarding the matters he intends to address.

Plaintiffs argue that Radtke's methodology is not reliable, that his testimony is not based on sufficient facts, and that his testimony will not assist the trier of fact.   Plaintiffs emphasize that no diagnostic test was performed to determine whether Mrs. Bullock suffered a seizure immediately prior to the wreck.   Plaintiffs also point out that Radtke never treated Mrs.

Bullock; nor did he speak to Mrs. Bullock or her family members and treating physicians.[3]

Radtke explained that the methodology he used in this case is the same methodology he would use if one of his patients consulted him about an event that may or may not be related to a seizure so that he can make adjustments to their care. Radtke is often asked by his patients to determine whether an epileptic seizure may have contributed to a car accident. Radtke explained that contemporaneous medical testing is generally not available to determine whether a spontaneous epileptic seizure occurred—and such testing was not done in this case. In reaching his medical opinions in his medical practice, Radtke generally relies on a history of the patient's event as described by eyewitness observers of the patient's behavior and not on the memory of his patients because people who suffer from seizures are generally considered unreliable historians due to amnesia and post-seizure confusion. Radtke also relies on scientific literature documenting that drivers who experience certain types of seizures can continue to operate a motor vehicle, albeit erratically.

---

[3] Plaintiffs also criticize Radtke for not reviewing the data underlying several tests that were performed by Mrs. Bullock's treating physicians well after the wreck. But, according to Defendants, Radtke reviewed all of the medical records he received from Plaintiffs. He did not review the underlying data because Plaintiffs did not produce it.

As previously explained, the Court's goal in exercising its gatekeeping role "is to ensure that an expert 'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Adams*, 760 F.3d at 1327 (quoting *Kumho Tire*, 526 U.S. at 152). Based on Radtke's expert report and deposition testimony, the Court is satisfied that Radtke, an epilepsy specialist, evaluated Mrs. Bullock's behavior using the same methodology he would have used if she were one of his patients. Plaintiffs did not point to any evidence that this methodology is not a reliable diagnostic approach employed by board-certified neurologists in diagnosing seizure events.

Plaintiffs argue that the Court should exclude Radtke's opinions because they contend his opinions are inconsistent with the assessment of the emergency medical personnel who responded to the scene fifteen to twenty minutes after Mrs. Bullock's wreck. Both EMTs testified that there was no way for them to know whether Mrs. Bullock had a seizure before the wreck unless they were on the scene when it happened. Radtke's proffered testimony is not inconsistent with the testimony of the EMTs, who could not say one way or the other if Mrs. Bullock suffered a seizure before the wreck. Even if it were, the inconsistency would go to the weight of his opinion, not its admissibility.

Plaintiffs also argue that Radkte's opinion does not "fit" this case because it will not help the jury understand whether the Passat and its component parts were defective.   While Radkte's opinion does not address whether the Passat was defective, his opinion is directly relevant and would be helpful to the jury on the issue of causation—whether driver error, instead of design defect, caused the wreck.

For all of these reasons, Plaintiffs' motion to exclude Radtke's testimony (ECF No. 54) is denied.

## CONCLUSIONS

For the reasons set forth above, Defendants' motions to exclude the testimony of Lee Hurley and Mark Hood (ECF Nos. 49, 50, 51, & 52) are denied.   Defendants' summary judgment motions (ECF Nos. 53 & 56) are granted as to Plaintiffs' claims for failure to recall/retrofit and for wantonness but denied as to the remainder of Plaintiffs' claims.   Plaintiffs' motion to exclude Rodney Radtke (ECF No. 54) is also denied.


IT IS SO ORDERED, this 11th day of May, 2015.

S/Clay D. Land
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA