IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

CHERYL BULLOCK and KEVIN          *
BULLOCK,
                                  *
      Plaintiffs,
                                  *
vs.
                                  *        CASE NO. 4:13-CV-37 (CDL)
VOLKSWAGEN GROUP OF AMERICA,
INC., VOLKSWAGEN AG, and          *
HONEYWELL INTERNATIONAL, INC.,
                                  *
      Defendants.
                                  *

O R D E R

A jury consisting of a teacher, a businesswoman, an IT manager, a retired Army veteran, a fast food crew chief, a sales manager, a social worker, a web developer and computer technician, a retail customer service representative, a microbiology supervisor, and a home health care aide, returned a verdict awarding Plaintiff Cheryl Bullock $7,000,000 for personal injuries she suffered in a wreck that they found was caused by a design defect in a Honeywell turbocharger in Mrs. Bullock's Volkswagen Passat vehicle.  This jury of six women and five men, three blacks and eight whites, also awarded Cheryl Bullock's husband, Kevin, $1,000,000 for loss of consortium.[1] Defendants ask this Court to negate the collective wisdom of

---

[1] One juror was excused during deliberations due to a personal emergency.

these representatives of the community. Because Defendants failed to point to any error of law and because the verdict was not against the great weight of the evidence, Defendants' motions for judgment as a matter of law and for a new trial (ECF Nos. 177, 180, 182) are denied.

After the jury returned its verdict, the Court reduced Plaintiffs' damages based on Georgia's comparative fault statute because the jury found that Mrs. Bullock was forty percent at fault in causing the wreck. *See generally Bullock v. Volkswagen Grp. of Am., Inc.*, No. 4:13-CV-37 (CDL), 2015 WL 5319791 (M.D. Ga. Sept. 11, 2015) (hereinafter "Bullock II"). The Court reduced Mrs. Bullock's damages of $7 million to $4.2 million and reduced Mr. Bullock's damages of $1 million to $600,000. *Id.* at *3. Plaintiffs ask the Court to reconsider that decision and alter the judgment to award the entire amount of the jury's verdict. As discussed below, that motion (ECF No. 179) is also denied.

DISCUSSION

I. **Defendants' Motions**

A. Legal Standards

The Court may only grant Defendants' renewed motions for judgment as a matter of law if the jury did "not have a legally sufficient evidentiary basis to find for" the Bullocks. Fed. R. Civ. P. 50(a)(1). In ruling on a motion for judgment as a

matter of law, the Court must "examine the evidence in a light most favorable to" the Bullocks. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty.*, 402 F.3d 1092, 1114 (11th Cir. 2005). The Court may grant Defendants' motions for judgment as a matter of law only if "the facts and inferences point overwhelmingly in favor of" Defendants, "such that reasonable people could not arrive at a contrary verdict." *Id.* (quoting *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999)).

The Court may grant Defendants' motions for a new trial if (1) the verdict was against the great weight of the evidence, *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1312-13 (11th Cir. 2013), or (2) the Court committed "substantial errors in admission or rejection of evidence or instructions to the jury," *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, (1940).

B. The Trial Record

Mrs. Bullock testified that while she was driving her 2004 Volkswagen Passat in a normal manner, it accelerated unexpectedly from seventy miles per hour to ninety miles per hour, and she was unable to bring it under control by removing her foot from the accelerator while also applying the brakes. As she attempted to bring the Passat under control, she struck another vehicle that was parked in the emergency lane. Her Passat then flipped down an embankment and came to rest on its

roof.   Mrs. Bullock suffered serious injuries from the crash, including fractured vertebrae in her neck, a head injury, broken bones, and multiple soft tissue injuries.   Her past medical expenses were stipulated to be $679,000.   She also presented a life care plan and other testimony of economic damages in support of a future damages claim exceeding $1 million.

In addition to Mrs. Bullock's testimony that her Passat accelerated unintentionally and uncontrollably, Plaintiffs presented expert testimony and Honeywell's own internal documents to prove that the vehicle accelerated uncontrollably because of a design defect in the Honeywell model GT1749V turbocharger in her Passat.   Plaintiffs' theory is that excessive oil leaked through a seal in the turbocharger into the engine and caused a surge of unintended acceleration.   Although Defendants obligatorily list every theoretically possible basis for judgment as a matter of law or a new trial, their primary complaint is that the Court should not have allowed testimony from Plaintiffs' two experts (Lee Hurley and Mark Hood) and that the Court should not have admitted certain Honeywell internal documents.

### 1.   Hurley's Trial Testimony

Before trial, the Court denied Defendants' *Daubert* motion that sought to exclude Lee Hurley's expert testimony.   *Bullock v. Volkswagen Grp. of Am., Inc.,* 107 F. Supp. 3d 1305, 1313

(M.D. Ga. 2015) (hereinafter "Bullock I").  As the Court noted in that Order, expertise gained by experience can be a powerful thing.[2]  *Id.* at 1308 (distinguishing between legitimate reliance on an expert based upon his vast experience and *ipse dixit* ("believe it solely because I said it"), a ubiquitous phrase in modern day *Daubert* motions to attack the opinions of an expert). Hurley's vast experience in automobile mechanics provides him with special expertise to testify about the issues related to the engine and turbocharger in Mrs. Bullock's Passat.  His description of that experience to the jury at trial confirmed the Court's evaluation of his qualifications at the *Daubert* hearing.  That experience provided Hurley with reliable principles and methods that he used to support his opinions in this case.  Accordingly, to help the jury understand some of the technical issues presented, the Court permitted the jury to hear Hurley's testimony under Federal Rule of Evidence 702.

Hurley, who has more than forty years of experience in motor vehicle engine mechanics, owns a specialty machine shop and full service automobile business in Birmingham, Alabama. Before starting his own business in 1971, Hurley was a maintenance instructor in the United States Army, where he did

---

[2] To illustrate the point, the Court made what is likely the first ever comparison of an auto mechanic to Diomede from Virgil's ancient epic poem The Aeneid. *Bullock I*, 107 F. Supp. 3d at 1308.  As explained in that Order, Virgil understood that the Latians should accept Diomede's advice to avoid war because Diomede had extensive personal experience with war—*experto credite* ("believe the expert").  *Id.*

mechanical work on Army helicopters.   After being discharged from the Army, Hurley did mechanical work for several legendary NASCAR drivers, including Buddy Baker, Bobby Allison, and Neil Bonnett.   Neil Bonnett actually worked for Hurley, sweeping the garage, when Bonnett was fifteen years old.   Bonnett later became a NASCAR driver, and Hurley did mechanical work for him. Hurley was also a NASCAR driver and drove a factory race car in the mid-1960s until he was involved in a serious accident in 1969.   After that accident, Hurley decided he would rather work on race cars than drive them.   Trial Tr. vol. II, 236:1-237:11 (ECF No. 165)

Hurley worked as Bobby Allison's crew chief doing chassis and engine work on his race car.   He built engines for several different Chrysler group race cars.   He was a NASCAR mechanic, builder, fabricator, and crew chief.   Some of the engines he built included turbochargers.   When Hurley first established his business in 1971, he built a lot of diesel turbocharged engines. While they were primarily commercial vehicles, Hurley continued his experience with diesel turbocharged engines when his traditional automobile customers brought their vehicles to his shop for repairs.   He has also developed vehicle components for some of the largest motor vehicle manufacturers.   *Id.* at 237:12-239:12.   One of Hurley's specialties through the years has been to inspect vehicle parts and diagnose problems with those parts.

Hurley has done such inspections on diesel engines with turbochargers. *Id.* at 239:24-240:1.

In addition to his hands-on experience, Hurley has taken many automotive training classes. And he trains other technicians at his shop, including NAPA Autocare employees. This training includes identifying problems with diesel engines and turbochargers. He is also a certified Rolls Royce technician. *Id.* at 240:16-20.

Hurley spends little time testifying as an expert witness—maybe one to ten percent of his time. He spends the rest of his time in his garage. *Id.* at 241:14-23. He clearly has expertise in motor vehicle engines, including the building of them, the rebuilding of them, the diagnosing of problems with them, and the fixing of them. This expertise covers engine components including diesel turbochargers.

Hurley inspected Mrs. Bullock's Passat and its components. He observed that the MAP sensor was "dripping with oil. And this is a component that should not have any oil on it. It could have some wetting on it, but it wouldn't be dripping." *Id.* at 249:8-11, 19-24. The fact that the sensor was dripping with oil "told [Hurley] that there was excessive oil in the intake system." *Id.* at 253:8-10. Hurley also observed wet oil on the hoses that connect to the intercooler. *Id.* 253:17-20.

On his second inspection, Hurley saw that the plastic crossover pipe that comes from the turbocharger intercooler was "dripping oil" even though it should not have been. *Id.* at 261:23-262:9.   And on his third inspection, when the turbocharger was disassembled, Hurley observed that neither the catalytic converter nor the tailpipe had "oil soaking on it." *Id.* at 265:1-4.   Based on that observation, Hurley concluded "that whatever created the enhanced power on the engine was at a balance point that was enough to create power, but not necessarily create excessive oil that would have gone out the tailpipe."   *Id.* at 265:5-8.   And when Hurley reviewed photographs of the Passat's component parts, he observed wet oil that was pooled "in the bottom" of the turbo inlet—where it is not normal to have "dripping oil."   *Id.* at 280:5-18.

In addition to his inspection of Mrs. Bullock's Passat, Hurley purchased a 2004 Volkswagen Passat that had the same engine and turbocharger as Mrs. Bullock's Passat, as well as similar mileage, tires, and automatic transmission.   When Hurley drove the exemplar vehicle, he felt the engine surge.   Hurley acknowledges that he tried to create a run-on event or surge by running the car at full throttle at different gears, which is not something a normal driver would do.   After this test, when Hurley took the vehicle back to his shop to inspect it, he "took a turbo hose off of the intercooler and . . . oil actually

8

flowed out of it." *Id.* at 268:11-24. Based on his inspection, Hurley determined that the oil had collected over a long period of time. He also concluded that the only source of the oil was the turbocharger and could not have been the crankcase ventilation system. *Id.* at 270:3-9, 17-24. Hurley cleaned all of the hoses and inspected the rest of the car; then he road tested it and did not experience any further problems.

Hurley ran a series of tests on the exemplar Passat using a dynamometer to determine if oil in the turbocharger's intake system would enhance the power to the diesel engine. In one of his runs, Hurley "injected engine oil into the inlet side of the pipes that feed the engine," and that test resulted in increased horsepower and increased torque. *Id.* at 274:4-9. Based on that test, Hurley concluded "that any type of oil in the intake system would enhance the power that the diesel engine would make." *Id.* at 275:16-18. He was unable to complete further tests because his testing ultimately broke the exemplar's motor.

Hurley also conducted inversion testing to determine whether inverting the car would cause oil to accumulate in areas where he found it "dripping" on Mrs. Bullock's Passat. Using a "rotisserie," Hurley inverted the exemplar vehicle for "30 minutes to several hours," and he "did not experience any oil that ran out of the inlet side of the engine." *Id.* at 282:4-12.

Finally, Hurley reviewed Defendants' testing on an exemplar vehicle.  He testified that this testing confirmed that added oil enhanced the performance of the engine and that the amount of oil Defendants used in their testing destroyed the turbocharger and thus emitted a plume of smoke through the tail pipe.  *Id.* at 284:14-286:2.

Based on all of his inspections and testing, Hurley opined that the amount of oil that he saw on the crossover pipes and in the intake system was enough to make the engine of Mrs. Bullock's Passat produce more power, causing the vehicle to accelerate.  *Id.* at 286:13-20.  He also observed that the brakes were "burned-up" and that the rotor was "blue from heat."  *Id.* at 248:15-20.  And he noted that if the brakes on Mrs. Bullock's Passat had not failed, the wreck probably would not have occurred.  *Id.* at 286:21-23.  Although Plaintiffs did not suggest that the brakes were defective, they did present evidence that Mrs. Bullock applied prolonged pressure to the brakes while the engine continued to accelerate, which arguably is consistent with the condition of the brakes described by Hurley.

    *2.  Hood's Trial Testimony and the Honeywell Reports*

From Hurley's testimony, a reasonable jury could conclude that any unintended acceleration of the Passat was likely due to excess oil migrating from the turbocharger to the engine.  But

Hurley gave no expert testimony as to whether that happened because of a design defect in the Honeywell turbocharger. Plaintiffs relied on Mark Hood, a materials engineer with experience in failure analysis, to make that connection. Hood is a professional engineer, and he has specialized in materials engineering and materials failure analysis for thirty years. Hood conducts forensic analyses to determine whether a product's design contributed to its failure to perform its function. In this case, Hood reviewed the turbocharger removal and teardown photos, examined the turbocharger components of Mrs. Bullock's Passat, reviewed documents produced by Honeywell, reviewed other literature, and examined exemplar turbocharger components. He also reviewed Mrs. Bullock's testimony describing the wreck and relied on Hurley's expert opinion that there was excessive oil in the turbocharger and that excessive oil in the turbocharger could cause unintended acceleration. Based on what he reviewed and examined, Hood opined that the Passat's turbocharger was defective because it allowed oil to leak past the compressor end seal. He also opined that a feasible alternative design existed.

In reaching his conclusions, Hood relied extensively on two Honeywell internal reports. First, Hood relied on a report by Phillippe Noelle entitled GT15 Platform Compressor Oil Seal Analysis and Improvement. *Daubert* Hearing Ex. List Attach. 6,

Noelle Report (Nov. 10, 2000), ECF No. 84-6.  The purpose of the Noelle Report was "to document the GT15 compressor oil seal analysis and improvement."  *Id.* at 2 ¶ 2.  The GT1749V turbocharger on Mrs. Bullock's Passat was part of the GT15 platform.  The Noelle report noted that the GT15 platform used a "simple design of compressor seal" consisting "of a thrust spacer and a piston ring."  *Id.* at 2 ¶ 4.  Several different designs, including a single-piston ring design, were tested in several applications and at different pressures.  *See* Trial Tr. vol. III 110:2-5, ECF No. 166 (noting that design 1.1 in the Noelle report is a single-piston ring design like the design of the compressor seal in Mrs. Bullock's Passat).  First, the designs were tested in a three-cylinder John Deere diesel engine.  Based on those tests, which revealed leaks at all three pressure levels tested, Noelle concluded that the "current seal design used in production for all GT15 platform turbocharger leaks prematurely."  Noelle Report 5.  In contrast, adding an "oil deflector" improved "the sealing capability," and there were no leaks with the design that included a deflector plate and an enhanced slinger design.  *Id.*

Next, the designs were tested in a three-cylinder Volkswagen diesel engine of 1.2-liter displacement and using a GT1441 turbocharger.  Design # 1.1 leaked in five of five tests, as did design # 2.1.  *Id.* at 6.  The report noted: "The oil

leaks are due to the fact that the turbocharger is not correctly matched for the engine even if the engine is motoring." *Id.* The report also noted that the turbocharger normally used with the Volkswagen diesel engine was a VNT1541 and that when the test was run with the VNT unit, there was no leak with design # 1.1. *Id.* The Noelle report concluded, "It is possible to improve the current GT15 platform compressor oil seal design by adding an oil deflector between the back-plate and the thrust bearing with or without a slinger"—though the back-plate and thrust spacer would need to be modified. *Id.* at 2 ¶ 3.

Hood also relied on a report by Diaa Hosny entitled Compressor End Seal Design Review and Preliminary Design Guidelines. *Daubert* Hearing Ex. List Attach. 5, Hosny Report (Jan. 9, 2001), ECF No. 84-5. The purpose of the Hosny report was "to summarize Garrett Engine Boosting Systems experience with compressor end seal leakage and to provide preliminary design guidelines." *Id.* at 1. The report describes the basic concept of a piston ring end seal and the tests for qualifying compressor end seals. The report notes that the GT15 platform standard design "will be vulnerable when applied to applications that run extensively at idle such as agricultural applications." *Id.* at 4. The Hosny report also references the Noelle report and notes that adding a deflector plate and slinger led to an improvement in seal performance. *Id.* And the report recommends

13

that a "deflector plate design may be needed . . . to improve seal capability." *Id.* at 7.   The Hosny report also discusses other alternative designs.  *Id.*

Based on these two reports, Hood opined that Honeywell knew that seal leakage was a problem in its GT15 platform turbochargers, that it sought to identify ways to test compressor seals, and that it looked for alternative designs to correct seal leakage issues.   Hood concluded that even though some of the testing in the Noelle report was on a John Deere diesel engine and not a car engine, the tests showed potential leakage issues that could occur in turbochargers in general. Trial Tr. vol. III 109:6-16.   He also determined that all of the tests in the Noelle report, including the compressor seal qualification tests on car engine turbochargers, showed that "the seal design on all of the GT15 will leak prematurely in these -- under the test conditions." *Id.* at 113:2-8.   And Hood concluded that the Hosny report established guidelines for improving the performance of the compressor seal.

After Hood determined that the two Honeywell reports established that there were issues with compressor seal leaks in the GT15 platform and that Honeywell had recommended guidelines for fixing the problem, Hood examined a turbocharger like the one in Mrs. Bullock's Passat.   He found that there was room for a deflector plate and an enhancement of the slinger, and he

opined that it would have been a relatively simple change.   *Id.*
at 106:15-107:14.   Honeywell's representative, Gavin Donkin,
confirmed that a deflector plate could have been put on the
GT1749V turbocharger but was not because Honeywell determined
that it was not needed in that application.   Trial Tr. vol. VI
234:6-235:15, ECF No. 169.

### 3.   *What Else the Jury Heard*

Defendants called their own experts.   They also had a
replica engine brought into the courtroom, and their trial
representative walked the jury through how that engine worked.
Members of the jury were able to see and touch it.   They also
heard an explanation of how this particular turbocharger was
developed and how it was supposed to work.   Defendants were able
to explain what the Honeywell documents meant, why they were
prepared and why they did not apply to passenger cars.   And
Defendants put up evidence to support their theory of the case,
which was that Mrs. Bullock had an epileptic seizure that caused
her to lose control of the Passat.

### C.   Testimony of Plaintiffs' Experts

Defendants' central contention is that the Court erred in
allowing Hurley and Hood to give opinions because their
methodology was not sufficiently reliable.   As the Court
previously observed, the Court's gatekeeping role under *Daubert*
*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 579 (1993)

requires the Court to determine whether an expert's testimony is sufficiently reliable to be presented to a jury. *Bullock I*, 107 F. Supp. 3d at 1309-10 (citing *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc)).   The Court must ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Frazier*, 387 F.3d at 1260 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).   To allow the testimony to be considered by the jury, the Court must find that "it is properly grounded, well-reasoned, and not speculative." *Id.* at 1262 (quoting Fed. R. Evid. 702 advisory committee notes (2000 amends)).   Therefore, the Court will again consider whether the testimony of Plaintiffs' experts was sufficiently reliable.

> 1.   *Mark Hood*

As discussed above, Hood concluded that the turbocharger in Plaintiffs' Passat was defective based on his examination of the components and the seal, his review of the reports, and Hurley's expert opinion that there was excessive oil in the turbocharger. He also opined that Honeywell should have added a deflector plate and modified the slinger in its design.

Defendants' main argument is that Hood did not use reliable engineering principles to form his opinion.   Their chief complaint is that Hood, without conducting any independent

testing of turbochargers like the one in Mrs. Bullock's Passat, relied on the Hosny and Noelle reports to explain why Hurley found excessive oil in the turbocharger.  Hood testified that he relied on the two reports and that experts in the engineering field rely on these types of reports in conducting materials failure analyses.  But Defendants contend that no reasonable engineer could rely on the Hosny and Noelle reports to reach the conclusions Hood did—that the seal design used in the GT15 platform had certain vulnerabilities and needed modification—mainly because the Hosny and Noelle reports did not test the precise turbocharger model at issue in this case in a passenger car application.  Defendants point out now, as they did at trial, that the Noelle report tested turbochargers in tractor engines and on cars where the turbocharger was not correctly matched for the engine.  They emphasize that when the tests were repeated with a turbocharger equipped with variable nozzle technology—like Mrs. Bullock's turbocharger had—the tests did not reveal leaks.  And they argue that the alternative designs were intended for different turbocharger designs in different applications.

Hood explained why these distinctions did not alter his opinion that the turbocharger seal in the Passat was defectively designed.  While the applications in the reports may have been different, the seals there were the same.  And in Hood's

17

opinion, the same deficiencies that allowed the leaks documented in the Noelle and Hosny reports existed in the Passat's Honeywell turbocharger. Defendants were able to cross-examine Hood thoroughly on his opinions and to point out all of the perceived flaws in his rationale to the jury. The Court finds that Defendants' criticisms of Hood's opinions go to the weight of Hood's testimony, not its admissibility.

Defendants also criticize Hood because he did not test any alternative designs to see (a) how much less oil would get into the air intake system with the alternative design and (b) if the alternative design would work in a 2004 Passat. Rather, as discussed above, Hood's design testimony relied on design features that were tested as documented in the Noelle report and were recommended in the Hosny report. Based on the testing documented in the Noelle report, the addition of a deflector plate and enhancement of the slinger eliminated leaks through the compressor seal. And when Hood examined a GT1749v turbocharger, he found that there was room for a deflector plate and an enhancement of the slinger. Thus, he opined that it would have been a relatively simple change to add them. Honeywell's representative confirmed that a deflector plate could have been put on the GT1749V turbocharger. Honeywell's own research and testing essentially established that the deflector plate would prevent oil seepage through the seal

better than the current design of the Honeywell Passat turbocharger.  Hood's reliance on Honeywell's own research and testing was reasonable, and his failure to conduct his own testing does not render his methodology unreliable.

Finally, Defendants contend that Hood did not conduct a risk-utility analysis to determine whether the risks in the turbocharger's design outweigh the utility derived from it.  The jury was properly instructed on the risk-utility factors.  *See* Trial Tr. vol. VII 94:18-96:20, ECF No. 170.  The jury heard evidence to support a conclusion that the risk of an oil leak such as that described by Hurley and Hood could have catastrophic consequences.  Members of the jury also heard evidence from which they could reasonably conclude that Honeywell knew of a simple alternative design that its testing showed would have eliminated the oil leak.  The Court finds that Hood's testimony should not be disregarded simply because he may not have expressly stated that he performed a "risk utility analysis."

In summary, the Court finds that it did not err in admitting Hood's testimony.

### 2.  Lee Hurley

Defendants attack Hurley's opinion that excessive oil existed in the intake system of the turbocharger and that such excessive oil can cause an unintended increase in power to the

engine.   They  argue  that  Hurley  did  not  employ  reliable
methodology because  he  did  not  measure  the  exact  amount  of  oil
in  the  intake  system  of  Mrs.  Bullock's  Passat  or  do  a  precise
comparison  of  the  amount  of  oil  found  in  Mrs.  Bullock's  Passat
to  the  amount  of  oil  normally  found  in  that  part  of  similar
vehicles.   Hurley  found  that  the  amount  of  oil  was  so  excessive
that  there  was  no  need  to  do  a  precise  measurement.   The  issue
was  not  whether  an  extra  drop  of  liquid  from  a  pipette  catalyzed
a  chemical  reaction.   Rather,  Hurley's  observation  that  the
amount  of  oil  he  saw  was  excessive  was  based  on  the  fact  that  he
saw  enough  oil  to  coat  the  components  and  drip  off  of  them  even
though,  based  on  his  many  years  of  experience  as  a  mechanic  who
worked  on  turbochargers,  there  should  not  have  been  dripping  oil
in  that  area  of  the  engine.

Defendants  also  argue  that  Hurley's  testing  on  the  exemplar
Passat  was  unreliable.   Defendants  point  out  that  while  Hurley
testified  that  he  had  conducted  between  thirty  and  forty  runs  on
the  dynamometer,  he  preserved  the  data  for  only  two  of  those
runs,  including  the  run  during  which  he  injected  oil  into  the
inlet  side  of  the  pipes  that  feed  the  engine.   The  Court  finds
that  Hurley's  failure  to  preserve  the  data  for  the  remainder  of
the  runs  does  not  render  his  methodology  unreliable;  it  simply
suggests  that  those  runs  did  not  result  in  a  run-on  event.
Defendants  also  highlight  that  Hurley  did  not  videotape  any  of

20

the tests and did not record how much oil he injected into the engine during the run that resulted in enhanced power to the engine.  Hurley explained his methodology in a way that enabled Defendants to understand what he did so that Defendants' experts could try to replicate his tests if they wished to do so.

Defendants further assert that Hurley improperly extrapolated causation from his tests on the exemplar.  First, Defendants contend that Hurley's road test should be ignored altogether because Hurley admitted that he tried to create a run-on event by running the car at full throttle in different gears to put some heat in the intake system and pull oil out of the intercooler—something a normal driver would never do.  According to Hurley, the test was simply to determine if he could create a run-on event during the road test.  After the test, Hurley observed that that oil flowed out of one of the hoses off the intercooler.  Second, Defendants point out that Hurley did not explain how much oil was needed to accelerate from seventy miles per hour to ninety miles per hour for sixty seconds.  Hurley testified that based on his dynamometer testing, oil injected into the inlet side of the pipes that feed the engine could enhance power to the engine.  He also explained that the intercooler in Mrs. Bullock's Passat was dripping with oil.  And he testified that the only source of that oil was from the turbocharger.  Thus, according to Hurley, if the jury

believed Mrs. Bullock's testimony that her car ran away from her on the day of the wreck, the most likely cause of the unintended acceleration was an oil leak from the turbocharger.

Defendants also contend that Hurley did not express his opinions to a reasonable degree of scientific certainty or probability.  Hurley stated that based on his inspection, his testing, and his experience as a mechanic, Mrs. Bullock's car had oil on the crossover pipes in the intake system, that it came from a source other than the crankcase ventilation system, and that "it was enough oil to gather up in the intercooler and under the conditions that this particular car experienced that day, was enough to enhance the fuel flow into the engine to make the engine produce more power."  Trial Tr. vol. II 286:13-20. The Court is satisfied that although Hurley, who the Court observes is not a professional witness, did not use the magic words "to a reasonable degree of scientific certainty," his testimony as a whole establishes that he held his opinions to the requisite degree of certainty required under the law.  No one in that courtroom was confused.  He clearly opined that, based on his extensive expertise and his inspection, the most likely cause of the unintended acceleration that Mrs. Bullock says she experienced was an oil leak from the turbocharger.

Defendants also criticize Hurley because he testified that he drained the exemplar car's oil before he ran the inversion

test.   Hurley testified that he drained the oil, cleaned the hoses, serviced the car, and then road tested it to make sure it ran properly before he put it on the rotisserie.  While neither side nailed down this issue at trial, Hurley presumably refilled the engine oil before he drove the car.

Defendants argue that even if Hurley's methodology was sufficiently reliable, it was prejudicial to admit his testing on the exemplar vehicle because the test conditions were not substantially similar to the conditions Mrs. Bullock experienced on the day of the wreck.  Thus, they contend that the evidence should have been excluded under Rule 403 of the Federal Rules of Evidence.  Defendants' argument suggests that Hurley's testing was a misleading attempt to re-enact Mrs. Bullock's wreck under different conditions.  But it was not intended to be a reenactment.  Hurley's tests on the exemplar were for the purpose of determining whether oil in the turbocharger's intake system would enhance the power to the diesel engine.  It was never a secret that the conditions of the exemplar tests were under different conditions than Mrs. Bullock's wreck, and Defendants were able to highlight that fact to the jury.  The probative value of Hurley's exemplar testing is not outweighed by a danger of unfair prejudice, confusion of the issues, or misleading the jury.

In summary, the Court finds that it did not err in admitting Hurley's testimony.

<u>D.</u>   <u>Defendants' Other Objections</u>

Defendants also contend that they should be granted a new trial because (1) the Court erred in admitting the Hosny and Noelle reports, (2) the verdict was against the great weight of the evidence, and (3) Plaintiffs' counsel made improper comments during his closing argument.

*1.   Hosny and Noelle Reports*

Defendants contend that the Hosny and Noelle reports are irrelevant to the issues in this case and that the Court should have excluded them.  Essentially, Defendants maintain that these reports related to turbochargers that were different than the one in Mrs. Bullock's Passat and described operating conditions different than those experienced by Mrs. Bullock.  The Court found the type of turbocharger referenced in the reports to be sufficiently similar given that it was from the same platform as the turbocharger in Mrs. Bullock's Passat.  The Court further found that while the operating conditions may not have been the same, the fact that the turbochargers showed leakage during their operation, the risk of which could be reduced, was sufficiently probative for an expert witness to be able to testify about the contents of the reports and for the reports to be admitted, particularly when the expert witness testified that

these types of reports are generally relied on by experts in the field.  The proper way to distinguish the situation in the reports from the present case was not by hiding it from the jury but through cross examination and testimony from Defendants' witnesses who could explain what the reports really meant. Defendants had this opportunity.

Specifically, the Noelle report recorded instances of compressor seal leakage in Honeywell turbochargers in the GT15 platform.  And the Hosny report recommended guidelines for fixing the leakage problem.  Defendants argue, as they did at trial, that the Hosny and Noelle reports show that GT15 turbochargers may leak when tested on agricultural engines or mismatched automobile engines but do not show that they may leak on automobile engines like the one in Mrs. Bullock's Passat. Defendants also argue that the Noelle reports prove that turbochargers equipped with variable nozzle technology do not leak because the tests on the Volkswagen engine did not reveal a leak when the single-piston ring design was tested with a variable nozzle technology turbocharger.

The Court finds, as it did at trial, that the two reports are relevant to the issue of defective design.  They relate to the GT15 platform of turbochargers, and the turbocharger in Mrs. Bullock's Passat was part of that platform.  Defendants emphasize that the Noelle report tested GT15 turbochargers on

tractor engines or on mismatched car engines.  And Defendants stress that while the Hosny report states general conclusions about the GT15 platform's design vulnerabilities, the only specific mention of leaks involving a Honeywell turbocharger on a Volkswagen engine relates to the GT12 turbocharger, which is not part of the GT15 platform.  These distinctions—which Defendants had an opportunity to highlight to the jury—do not mean that the reports are irrelevant to the issues in this case. The reports are relevant to Defendants' knowledge of the risk of leakage, the ability to avoid that risk with another design, and the feasibility of an alternative design.  Defendants vigorously cross-examined Plaintiffs' witnesses on the distinctions, and they explained to the jury why the documents should be given little weight.

The Court also finds that the probative value of the two reports was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Defendants argue that Plaintiffs' experts read portions of the reports in a way that was misleading.  Defendants had a chance to cross-examine those experts and to call their own experts to explain the documents.  And the members of the jury had an opportunity to read the documents for themselves.  For all of these reasons, the Court finds that the Hosny and Noelle reports were properly admitted.

2.   *The Weight of the Evidence*

The last refuge for any good lawyer seeking protection from the mighty hand of a jury is the plea for a "re-do" because the verdict was against the great weight of the evidence.   But sometimes good lawyers lose, and when the evidence supports the jury verdict, the Court can't step in to provide shelter.

The Court rejects Defendants' argument that the jury did not have enough evidence to determine whether the risk presented by the alleged defect in the turbocharger outweighed the utility of that particular design.   The jury was properly instructed on the risk-utility factors.   *See* Ct.'s Instrs. to the Jury, Trial Tr. vol. VII 94:18-96:16.   And, as discussed above, the jury had enough evidence to conclude that the risks outweighed the benefits of the design given the relatively simple alternative design Honeywell knew about.

The Court also rejects Defendants' argument that there was a lack of evidence on causation.   First, Mrs. Bullock testified that her car accelerated uncontrollably and that she could not slow it down.   Hurley testified, based on his testing (and the testing by Defendants' experts), that excessive oil in the intake system could enhance power to the engine and create an unintended acceleration event.   He also testified that he observed excessive, "dripping" oil in the intake system of Mrs. Bullock's Passat, which was enough to enhance fuel flow into the

27

engine and make the engine produce more power.  And he noted that the brakes on Mrs. Bullock's Passat had failed.  Thus, if the jury believed Mrs. Bullock's testimony that her car ran away from her on the day of the wreck even though she was pressing the brake pedal, then Hurley's testimony was sufficient to establish that the most likely cause of the unintended acceleration was an oil leak from the turbocharger.

Defendants contend that their experts' testing revealed that the injection of diesel oil into a vehicle's intake system would not result in increased power but would result in plumes of dark smoke.  Hurley addressed this point and testified that Defendants' testing confirmed that added oil enhanced the performance of the engine but that the amount of oil Defendants used in their testing destroyed the turbocharger and thus emitted a plume of smoke through the tail pipe.

Defendants next argue that the evidence conclusively established that Mrs. Bullock did not apply the brakes and that Mrs. Bullock's testimony regarding the events leading up to the wreck was thus implausible.  While there was evidence, including eyewitness testimony from the Stewarts, that Mrs. Bullock did not use the brakes, there was also evidence from which a jury could conclude that she did: Mrs. Bullock testified that she applied the brakes, the driver of the truck whose brake lights the Stewarts claimed to see did not have his foot on the brakes,

and Mrs. Bullock's orthopedist testified that her injuries were consistent with Mrs. Bullock having her foot on the brake pedal at the time of the wreck.

Finally, Defendants contend that the evidence overwhelmingly established that Mrs. Bullock suffered from a complex partial seizure at the time of the wreck and that is what caused the wreck. Defendants vigorously fought to prove this theory of the case. But there was also evidence from which the jury could conclude that Mrs. Bullock did not suffer a seizure at the time of the wreck, including Mrs. Bullock's testimony that she did not have a seizure and the testimony of the medical personnel who did not diagnose Mrs. Bullock with a seizure or treat her for one. And there was evidence from which the jury could find that Mrs. Bullock only suffered from tonic-clonic seizures—not complex partial seizures—before the wreck.

In summary, the jury's verdict was not against the great weight of the evidence.

### 3. Plaintiffs' Allegedly Improper References

Defendants contend that Plaintiffs' counsel elicited improper testimony from Hood regarding an issue with GM ignition switches. Hood did testify about his work on the GM Cobalt ignition switch litigation as part of his background and qualifications. Trial Tr. vol. III 64:11-17. When Defendants objected to further discussion of the issue based on relevance,

the Court sustained the objection. *Id.* at 137:16-23. The Court finds that Hood's limited reference to the GM ignition switch issue did not impair the jury's consideration of the case. *See BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1474 (11th Cir. 1992) ("The standard for determining whether a jury verdict should be set aside as a result of misconduct of counsel is whether the conduct was 'such as to impair gravely the calm and dispassionate consideration of the case by the jury.'") (quoting *Allstate Ins. Co. v. James*, 845 F.2d 315, 318 (11th Cir. 1988)).

Defendants also argue that Plaintiffs' counsel made improper statements in his closing argument. First, counsel referenced the GM ignition switch issue. Trial Tr. vol. VII 73:12-16. When Defendants objected, the Court admonished counsel to stick to the evidence. *Id.* at 73:21-22. This reference did not impair the jury's consideration of the case.

Defendants also note that Plaintiffs' counsel asked the jury to tell Defendants that their conduct was unacceptable and that he hoped the jury would tell Defendants "that that's not right." *Id.* at 86:21-87:8. Defendants' counsel immediately objected, and the Court stated, "there's not a punitive damage claim in this case. What the jury has got to determine is if they find there was a defect and it caused the wreck what the amount of compensatory damages should be under the law to

compensate the plaintiffs." *Id.* at 87:11-15.  The Court further noted that nothing in the jury's verdict "should send a message with regard to this product because there's not a punitive damages claim in the case." *Id.* at 87:18-20.  Then, the Court instructed the jury:

> Your decision in this case must be based only on the evidence that was presented here in the courtroom. You must not be influenced in any way by either sympathy or prejudice in this case. You cannot base your decision on sympathy for or prejudice against anyone. You must follow the law as I explain it, even if you do not agree with that law, and you must follow all of my instructions as a whole. You cannot single out or disregard any of my instructions on the law.

*Id.* at 88:14-21.  The Court further instructed:

> In considering the issue of damages, you're instructed that you should assess the amount that you find to be justified by a preponderance of the evidence as full, just, and reasonable compensation for all of the plaintiffs' damages, no more and no less. Compensatory damages are not allowed as a punishment and must not be imposed or increased to penalize the defendants. *That's what I want to make sure that you understand there's no claim here for punitive damages that exist in some cases where you award damages to punish a defendant, to send a message to a defendant. That is not this case. This case is a claim for compensatory damages to compensate the plaintiff for their injuries if you find that the defendants are legally responsible.*

*Id.* at 98:10-22 (emphasis added).  The Court is satisfied that its instructions cured any problem created by counsel's statement.

E.    Summary

In summary, the Court finds that it did not err by allowing the testimony of Hurley and Hood and by admitting the Hosny and Noelle reports.   The Court further finds that the verdict was not against the great weight of the evidence and that the Court's instructions to the jury cured any problem created by Plaintiffs' counsel's remarks during closing argument.   For these reasons, Defendants are not entitled to judgment as a matter of law or a new trial.[3]

## II.  Plaintiffs' Motion to Amend the Judgment

Plaintiffs ask the Court to reconsider its decision to reduce their damages based on the jury's finding that Mrs. Bullock was forty percent at fault in causing the wreck.   The Court previously found that Georgia's comparative fault statute, O.C.G.A. § 51-12-33, applies to all actions "brought against one or more persons for injury to person or property" and "provides no exception for actions based on a theory of strict liability."

---

[3] In their motions, Defendants also listed two other reasons for granting a new trial:   (1) Plaintiffs' alleged failure to prove that their Passat was in the same or substantially the same condition at the time of the wreck as it was when it left Defendants' possession and control; and (2) the evidence was insufficient to support the damages awarded.   The Court notes that Defendants did not argue in support of these positions in their briefs, and therefore, have likely waived them.   But even if Defendants did not waive these arguments, the Court finds that Plaintiffs presented sufficient evidence to uphold the jury verdict.   Given the limited discussion of these issues in Defendants' briefs, the Court finds little reason to expand this Order to address thoroughly issues that Defendants deemed worthy of so little attention.

*Bullock II*, 2015 WL 5319791, at *2. To reach that conclusion, the Court relied on the plain language of the statute and the Georgia Supreme Court's analysis in *Couch v. Red Roof Inns, Inc.*, 291 Ga. 359, 364-65, 729 S.E.2d 378, 383 (2012). In support of their present motion to amend, Plaintiffs cite dicta from *Patterson v. Long*, 321 Ga. App. 157, 741 S.E.2d 242 (2013) and the non-binding case of *Hernandez v. Crown Equipment Corp.*, Civil Action No. 7:13-CV-91 (HL), 2015 WL 4067695 (M.D. Ga. July 2, 2015). The Court considered those cases in deciding its previous Order and rejected Plaintiffs' argument that they should bind the Court here.

After the Court issued its Order reducing Plaintiffs' damages, the Georgia Supreme Court decided *Walker v. Tensor Machinery Ltd.*, 779 S.E.2d 651, 652 (Ga. 2015), which further supports the Court's conclusion. In that case, the Georgia Supreme Court reaffirmed its holding in *Zaldivar v. Prickett*, 297 Ga. 589, 603, 774 S.E.2d 688, 699 (2015) and concluded that O.C.G.A. § 51-12-33(c) allows a "jury to assess a percentage of fault to the non-party employer of a plaintiff who sues a product manufacturer and seller for negligence in failing to warn about a product danger, even though the non-party employer has immunity under" Georgia's Workplace Compensation Act. *Walker*, 779 S.E.2d at 652. The Georgia Supreme Court noted that "a meritorious affirmative 'defense or immunity may cut off

33

liability, [but] a tortfeasor is still a tortfeasor, and nothing about his defense or immunity' means that he was not at fault by his commission of a tort that was the proximate cause of the plaintiff's injury." *Id.* at 653-54 (alteration in original) (quoting *Zaldivar*, 297 Ga. at 597, 774 S.E.2d at 695). *Walker* bolsters the Court's finding that the comparative fault statute applies to product defect actions asserted under a strict liability theory and "that the Georgia courts are likely to hold that Georgia's comparative fault statute requires a reduction in Mr. Bullock's loss of consortium claim based on the percentage of Mrs. Bullock's fault." *Bullock II*, 2015 WL 5319791, at *3. For all of these reasons, Plaintiffs' Motion to Amend the Judgment is denied.

CONCLUSION

This case is not as complicated as counsel or this Court's much too lengthy Order would suggest. Mrs. Bullock says that as she operated her Passat vehicle on an open road, it accelerated although she made no driver input to cause the acceleration. She further says that as she removed her foot from the accelerator, the car did not slow down. A distinguished and experienced mechanic examined the Passat after the wreck and found excessive oil dripping in areas of the engine and turbocharger from which oil should not drip. The amount and location of that oil was consistent with it leaking from the

34

turbocharger area in a manner that the design of the turbocharger should prevent. Allowing oil to leak as it did can cause an acceleration event consistent with the one described by Mrs. Bullock because extra fuel is being unintentionally provided to the engine. The likely reason that the oil leaked where it did, according to an expert on design failure, is that the seal was not properly designed. The cover to the opening was not adequate to prevent oil from seeping through it. According to their own internal documents, Honeywell knew how to design a seal that would likely prevent the seepage of oil through the opening. Had Honeywell simply used the type of turbocharger seal design that it uses on other turbochargers it manufactures, the leak likely would not have occurred. And had the leak not occurred, there would not have been an acceleration event. Without the acceleration event, Mrs. Bullock would not have lost control of her vehicle. The evidence in this case does not demand that a jury make these findings, but it certainly supports their decision to do so.

When considering motions accompanied by scholarly briefs with exhaustive citations to the transcript and legal authority, it is sometimes easy, amidst that mound of paperwork and in the cloistered environment of a judge's chambers, to lose sight of what happened here. Citizens from varied walks of life were summonsed to a courtroom. They took an oath to listen to the

evidence, follow the law, and render a verdict that spoke the truth.  They heard witnesses, they saw witnesses, and they sized up witnesses.  They touched evidence including an engine and component parts with oil still left from the day of the wreck. They were instructed that certain witnesses could give their opinions, but as with any other witness, they did not have to accept those opinions as true or accurate.  They heard both sides of the technical issues.  They witnessed thorough and sifting cross examinations, the best tool for ferreting out the credible from the incredible.  They were instructed on the law. And they made a unanimous decision, a decision that this Court finds was supported by ample evidence and a decision that should not be disturbed.  Defendants' motions (ECF Nos. 177, 180, 182) are denied.  Plaintiffs' motion to alter the judgment (ECF No. 179) is likewise denied.

IT IS SO ORDERED, this 2nd day of February, 2016.

S/Clay D. Land
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA